IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CAPE FEAR PUBLIC UTILITY AUTHORITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 7:17-CV-195-D |
| | ) | |
| THE CHEMOURS COMPANY FC, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| BRUNSWICK COUNTY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 7:17-CV-209-D |
| | ) | |
| E.I. DU PONT DE NEMOURS AND COMPANY, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

On January 31, 2018, the Cape Fear Public Utility Authority ("CFPUA") and Brunswick

County (the "County"; collectively "plaintiffs") filed a Master Complaint of Public Water Suppliers

against DowDuPont, Inc. ("DowDuPont"),[1] E.I. du Pont de Nemours and Company ("DuPont"), The

Chemours Company, and The Chemours Company FC, LLC ("Chemours"; collectively

"defendants") alleging that defendants discharged toxic chemicals, including perfluoro-2-

---

[1] On March 1, 2018, the County voluntarily dismissed without prejudice DowDuPont as a
defendant. See Brunswick Cty. v. E.I. du Pont de Nemours & Co., No. 7:17-CV-209-D [D.E. 45–47]
(E.D.N.C. Mar. 1, 2018). On March 2, 2018, CFPUA voluntarily dismissed without prejudice
DowDuPont as a defendant. See Cape Fear Pub. Util. Auth. v. Chemours Co. FC, No. 7:17-CV-195-
D [D.E. 35] (Mar. 2, 2018).

propoxypropanoic acid ("GenX"), from the Fayetteville Works facility into the Cape Fear River and surrounding air, soil, and groundwater. See Master Compl., Brunswick Cty., No. 7:17-CV-209-D [D.E. 35] (E.D.N.C. Jan. 31, 2018). On the same date, plaintiffs and other entities filed Notices to Conform as supplements to the Master Complaint. See Notices to Conform, Brunswick Cty., No. 7:17-CV-209-D [D.E. 36–39] (E.D.N.C. Jan. 31, 2018); Notice to Conform, Cape Fear Pub. Util. Auth., No. 7:17-CV-195-D [D.E. 29] (E.D.N.C. Jan. 31, 2018).[2] On March 2, 2018, defendants moved to dismiss the master complaint, to alternatively stay the proceedings, and to dismiss plaintiffs' notices to conform [D.E. 49] and filed a memorandum in support [D.E. 50].[3] On April 13, 2018, plaintiffs responded in opposition [D.E. 61]. On April 27, 2018, defendants replied [D.E. 65]. On March 26, 2019, the court granted in part and denied in part defendants' motion to dismiss the master complaint, denied defendants' motion to stay, and granted defendants' motion to strike the notices to conform [D.E. 85]. The court enters this order to explain that decision.

I.

A.

This case concerns perfluoroalkyl substances ("PFASs"). See Master Compl. [D.E. 35] ¶¶ 1–5, 68–89. PFASs are a class of man-made chemical compounds that contain carbon chains that are fully saturated with fluorine (i.e., carbon-fluorine bonds replace all carbon-hydrogen bonds). See id. ¶ 69. PFASs are classified and named based on the length of the carbon chain in the molecule. See id.; cf. id. ¶¶ 73–85. PFASs do not naturally occur in the environment and degrade slowly under

---

[2] Brunswick County, CFPUA, the Town of Wrightsville Beach, and the Lower Cape Fear Water & Sewer Authority filed Notices to Conform.

[3] Unless otherwise noted, citations to the docket will reflect the docket numbers from Brunswick Cty., No. 7:17-CV-209-D.

environmental conditions. See id. ¶¶ 69–70. Plaintiffs also allege that PFASs are generally understudied and that their toxicological properties are not well understood. See id. ¶ 71. Within the general class of PFASs, plaintiffs identify three subgroups: (1) perfluorocarboxylic acids ("PFCAs"), compounds containing a carboxylic acid functional group; (2) perfluorosulfonic acids ("PFSAs"), compounds containing a sulfonic acid functional group; and (3) perfluoroalkyl ether carboxylic acids ("PFECAs"), compounds containing both a carboxylic acid and an ether functional group. See id. ¶ 68 & n.40. PFASs have been manufactured for use in various commercial products. See id. ¶¶ 2, 69.

Plaintiffs distinguish between "long-chain PFASs" and "short-chain PFASs," although they allege that exposure to any PFAS causes cumulative harm. See id. ¶¶ 72–89. As for long-chain PFASs, plaintiffs identify two relevant compounds: a PFCA called perfluorooctanoic acid ("PFOA" or "C8") and a PFSA called perfluorooctanesulfonic acid ("PFOS"). See id. ¶ 73. Both compounds contain eight carbon chains. The effects of exposure to long-chain PFASs have been better studied than short-chain PFASs. See id. Plaintiffs allege that "the growing body of epidemiological evidence" supports the association between "specific long-chain PFASs and adverse outcomes, including associations with testicular and kidney cancers, liver malfunction, hypothyroidism, high cholesterol, ulcerative colitis, lower birth weight and size, obesity, decreased immune response to vaccines, and reduced hormone levels and delayed puberty." Id. ¶ 74. Plaintiffs also allege that, in 2009, the Environmental Protection Agency ("EPA") addressed C8 and PFOS in particular, and the EPA established a combined health advisory concentration for the two chemicals of 70 parts per trillion ("ppt") in drinking water. See id. ¶¶ 76–78.

As the EPA began to address long-chain PFASs, industry shifted to using short-chain PFASs. See id. ¶ 79. As for short-chain PFASs, plaintiffs identify three relevant compounds: a PFECA

3

called GenX, Nafion Byproduct 1, and Nafion Byproduct 2. See id.[4] Plaintiffs allege that "DuPont has been studying the health effects of . . . GenX since [at] least 1963" and that "evidence exists to support the toxicity of PFECAs in humans and animals." Id. ¶¶ 81–82. Specifically, plaintiffs allege that animal studies have shown GenX to be "a significantly toxic PFAS" that "may in fact be as toxic or more toxic to humans than [C8]." Id. ¶ 86 (emphasis omitted); see id. ¶¶ 83–85. Plaintiffs concede, however, that human studies have not yet been performed. See id. ¶ 86. In July 2017, the North Carolina Health and Human Services Department established a preliminary health goal for GenX in drinking water of 140 ppt. See id. ¶ 88. However, plaintiffs allege that North Carolina erroneously set the preliminary goal because the goal depended on allegedly misleading publications that DuPont funded and that the true safe level of GenX in drinking water is lower. See id.

## B.

Plaintiffs are "public water suppliers and/or governmental entities as set forth in the Notice to Conform separately filed by each Plaintiff." Id. ¶ 9.[5] The Fayetteville Works facility is located approximately fifteen miles southeast of Fayetteville, and the Cape Fear River runs to the east of the facility. See id. ¶ 32. The groundwater under the facility discharges into the Cape Fear River. See id. ¶ 38. DuPont constructed the Fayetteville Works facility in the 1970s. See id. ¶ 33. Currently,

---

[4] Plaintiffs have not identified the chemical compounds that they have labeled "Nafion Byproduct 1" and "Nafion Byproduct 2." See Master Compl. [D.E. 35] ¶¶ 65, 68. Plaintiffs allege that the two compounds are "two byproducts of the Nafion perfluorosulfonic acid . . . membrane manufacturing process." Id. ¶ 68. Plaintiffs allege that the compounds are perfluoroalkyl ether sulfonic acids ("PFESAs"). See id. ¶¶ 65, 68.

[5] Plaintiffs supplemented the Master Complaint by filing Notices to Conform. Each Notice to Conform contains statements concerning the plaintiffs' identities and the harms that they each individually suffered. On March 26, 2019, the court granted defendants' motion to strike plaintiffs' Notices to Conform [D.E. 85]. Plaintiffs' Notices to Conform violate the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 4(h), 7.

4

Chemours owns the facility and leases manufacturing space to DuPont. See id. ¶¶ 5, 34.

DuPont manufactures some commercial products using PFASs. See, e.g., id. ¶ 16. For example, DuPont manufactured Teflon nonstick cookware using C8. See id. Plaintiffs allege that, from 1951 until 2002, DuPont purchased C8 from the 3M Company ("3M"). See id. By May 2002, after years of civil lawsuits and EPA investigation into the environmental and health effects of C8, 3M stopped manufacturing C8. See id. ¶¶ 19–21. In October 2002, DuPont began manufacturing C8 at the Fayetteville Works facility for use in manufacturing various products. See id. ¶¶ 21–22. In December 2005, the EPA "uncovered evidence that DuPont concealed the environmental and health effects of C8" and "announced the 'Largest Environmental Administrative Penalty in Agency History.'" Id. ¶ 22. DuPont also agreed to prevent C8 from further entering the environment and to eliminate its use altogether by 2015. See id. ¶ 23.

By 2009, plaintiffs allege that "DuPont negotiated with [the EPA] to manufacture GenX at DuPont's Fayetteville Works facility in North Carolina" and that the EPA "determined that the chemical could be commercialized if there were no releases to water." Id. ¶ 24 (quotation and emphasis omitted); see id. ¶ 3. By April 28, 2013, DuPont reported that it had ceased intentionally producing C8 at the Fayetteville Works facility and instead was producing GenX for use in manufacturing Teflon products. See id. ¶ 26.

In July 2015, DuPont spun off its chemical division into Chemours, a newly-created and publicly-traded company. See, e.g., id. ¶¶ 4–5, 27–28. As part of the transaction, Chemours took ownership of the Fayetteville Works facility and leased manufacturing space in the facility to DuPont. See id. ¶¶ 5, 30, 34. Plaintiffs allege that defendants presently operate three perfluorinated chemical manufacturing areas within the facility. See id. ¶ 35. Defendants operate under a National Pollutant Discharge Elimination System permit ("NPDES permit"), which North Carolina issued to

5

defendants. See id. ¶¶ 52–53. Defendants' NPDES permit does "not authorize any discharges of GenX or other PFECAs or other [PFASs]." Id. ¶ 53. Plaintiffs allege that defendants represented that defendants were not discharging PFASs into the Cape Fear River. See, e.g., id. ¶ 56.

Between June 14, 2013, and December 2, 2013, Dr. Detlef Knappe ("Knappe"), a professor at North Carolina State University, collected daily water samples from the Cape Fear River upstream and downstream of the Fayetteville Works facility. See id. ¶ 59. In November 2016, Dr. Knappe published the results of the study. See id. Dr. Knappe detected GenX in the water downstream of the Fayetteville Works facility with an average concentration of 631 ppt and a maximum concentration of approximately 4,500 ppt. See id. In addition, Dr. Knappe detected at least six other PFECAs in the water samples. See id. Dr. Knappe repeated the tests in August 2014 and found similar levels of GenX. See id. ¶ 60. All told, Dr. Knappe detected at least seventeen different PFASs in the Cape Fear River and in groundwater surrounding the Fayetteville Works facility. See id. ¶ 68 & n.40.

Dr. Knappe's study raised awareness of defendants' practices at the Fayetteville Works facility. Plaintiffs allege that, on June 15, 2017, Chemours admitted to state and local regulators that it had been discharging GenX into the Cape Fear River since 1980 as a byproduct of another manufacturing process. See id. ¶ 62. Plaintiffs also allege that, in July 2017, Chemours admitted that it had detected additional PFASs besides GenX and C8 at the Fayetteville Works facility. See id. ¶ 73. In August 2017, state regulators requested that water samples be taken from the groundwater near the Fayetteville Works facility. See id. ¶ 64. Thirteen of the fourteen samples contained GenX at concentrations exceeding the practical quantitation limit ("PQL") of 10 ppt, and groundwater monitoring wells at Fayetteville Works showed "GenX at concentrations from 519 to 61,300 ppt." Id. In an outfall where defendants discharged wastewater into the Cape Fear

6

River—wastewater that defendants represented did not contain PFASs—the EPA detected Nafion Byproduct 1 at concentrations as high as 15,800 ppt and Nafion Byproduct 2 at concentrations as high as 73,900 ppt. See id. ¶ 65. In sum, plaintiffs allege that defendants have knowingly discharged PFASs into the Cape Fear River and the soil, air, and groundwater surrounding the Fayetteville Works facility since at least 1980. See, e.g., id. ¶¶ 40, 45.

Plaintiffs allege that PFASs have been detected in the Northwest Water Treatment Plant. See id. ¶¶ 94–95. In 2017, plaintiffs allege that GenX was found in treated water at the Northwest Water Treatment Plant in concentrations ranging from 695 to 910 ppt. See id. ¶ 94. In addition, the University of North Carolina at Wilmington has tested water samples from the CFPUA weekly, and the tests have confirmed "the presence of C8, GenX, and other perfluorinated chemicals in both raw and treated water at [CFPUA's] Sweeney Water Treatment Plant." Id. ¶ 95. Plaintiffs allege that they have suffered damages as a result of defendants' alleged discharge of chemicals, including "contamination of their property and/or public water supply." Id. ¶ 98. Moreover, plaintiffs allege that any voluntary reduction by defendants has not meaningfully addressed the discharge of PFASs from the Fayetteville Works facility. See ¶¶ 96–97.

On January 31, 2018, plaintiffs filed a Master Complaint against defendants alleging ten causes of action: public nuisance, private nuisance, trespass to real property, trespass to chattels, negligence per se, negligence, failure to warn, negligent manufacture, riparian rights/injunctive relief, and punitive damages. See Master Compl. [D.E. 35] ¶¶ 99–147. Plaintiffs seek compensatory damages, punitive damages, and injunctive relief. See id. at 36.

## II.

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–

63 (2007); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to the [nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 352 (4th Cir. 2014); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 135 S. Ct. 2218 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a plaintiff's allegations must "nudge[ ] [his] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

The motion to dismiss requires the court to consider the plaintiffs' state-law claims, and the parties agree that North Carolina law applies. Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issues. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from that court, this court may consider the opinions of North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted).[6] In predicting how the highest

---

[6] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013).

8

court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999). Moreover, in predicting how the highest court of a state would address an issue that it has not yet resolved, this court must "follow the decision of an intermediate state appellate court unless there [are] persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted).

### III.

### A.

In count one, plaintiffs allege that defendants' "operation of the Fayetteville Works facility, and their discharges, emissions, and releases of [PFASs] . . . create a public nuisance." Master Compl. [D.E. 35] ¶ 100. Defendants argue that the court should dismiss this claim because plaintiffs have failed to allege either an unreasonable interference or "unusual or special damage." See [D.E. 50] 21–22.

"A public nuisance exists wherever acts or conditions are subversive of public order, decency, or morals, or constitute an obstruction of public rights." State v. Everhardt, 203 N.C. 610, 617, 166 S.E. 738, 741–42 (1932) (quotation omitted); Twitty v. State, 85 N.C. App. 42, 49, 354 S.E.2d 296, 301 (1987). "A public nuisance affects the local community generally and its maintenance constitutes an offense against the State." Twitty, 85 N.C. App. at 49, 354 S.E.2d at 301. "Whatever tends to endanger life, or generate disease, and affect the health of the community . . . is generally, at common law, a public nuisance." Everhardt, 203 N.C. at 618, 166 S.E. at 742.

Under North Carolina law, a private plaintiff must have standing to bring a claim for public nuisance. See Neuse River Found., Inc. v. Smithfield Foods, Inc., 155 N.C. App. 110, 114, 574

9

S.E.2d 48, 52 (2002). Unlike standing under Article III, standing under North Carolina law refers "generally to a party's right to have a court decide the merits of a dispute." Id., 574 S.E.2d at 52 (collecting cases); see, e.g., Stanley v. Dep't of Conservation & Dev., 284 N.C. 15, 28, 199 S.E.2d 641, 650 (1973). A private party has standing to bring a public nuisance claim "as long as the party has suffered an injury that cannot be considered merged in the general public right." Neuse River Found., Inc., 155 N.C. App. at 115, 574 S.E.2d at 52; see Barrier v. Troutman, 231 N.C. 47, 49, 55 S.E.2d 923, 925 (1949) ("[N]o action lies in favor of an individual in the absence of a showing of unusual and special damage, differing from that suffered by the general public."); Hampton v. N.C. Pulp Co., 223 N.C. 535, 543–44, 27 S.E.2d 538, 544 (1943); cf. Rhodes v. E.I. du Pont de Nemours & Co., 636 F.3d 88, 97 (4th Cir. 2011) (applying West Virginia law and holding that there is no West Virginia statutory or common law authority suggesting a class action exception to the special-injury rule).

To state a public nuisance claim as private parties, plaintiffs must allege "(1) injury to a protected interest that cannot be considered merged in the general public right; (2) causation; and (3) proper, or individualized, forms of relief." Neuse River Found., Inc., 155 N.C. App. at 116, 574 S.E.2d at 53. Plaintiffs have not plausibly alleged "special and unique damage" caused by defendants' alleged interference with plaintiffs' property. See Barrier, 231 N.C. at 50, 55 S.E.2d at 925 (collecting cases); Hampton, 223 N.C. at 544–48, 27 S.E.2d at 544–47 (discussing injury to fishing business); Neuse River Found., Inc., 155 N.C. App. at 116, 574 S.E.2d at 53. Accordingly, the court grants defendants' motion to dismiss count one.

### B.

In count two, plaintiffs allege that defendants' discharge of chemicals from the Fayetteville Works facility constitutes a private nuisance [D.E. 35] ¶¶ 110–14. Under North Carolina law,

10

plaintiffs seeking to recover for a private nuisance must show a substantial and unreasonable interference with the use and enjoyment of their property. See Kent v. Humphries, 303 N.C. 675, 677, 281 S.E.2d 43, 45 (1981); Morgan v. High Penn Oil Co., 238 N.C. 185, 193–94, 77 S.E.2d 682, 689 (1953); Barrier, 231 N.C. at 49–50, 55 S.E.2d at 925; BSK Enters., Inc. v. Beroth Oil Co., 246 N.C. App. 1, 24–25, 783 S.E.2d 236, 252 (2016); The Shadow Grp., LLC v. Heather Hills Home Owners Ass'n, 156 N.C. App. 197, 200, 579 S.E.2d 285, 287 (2003); Jordan v. Foust Oil Co., 116 N.C. App. 155, 167, 447 S.E.2d 491, 498 (1994); Grant v. E.I. du Pont de Nemours & Co., No. 4:91-CV-55-H, 1995 WL 18239435, at *5 (E.D.N.C. July 14, 1995) (unpublished). An interference is substantial when it results in significant annoyance, some material physical discomfort, or injury to plaintiffs' health or property. See Watts v. Pama Mfg. Co., 256 N.C. 611, 617, 124 S.E.2d 809, 813–14 (1962); Pake v. Morris, 230 N.C. 424, 426, 53 S.E.2d 300, 301 (1949); Duffy v. E.H. & J.A. Meadows Co., 131 N.C. 31, 34, 42 S.E. 460, 461 (1902); The Shadow Grp., LLC, 156 N.C. App. at 200, 579 S.E.2d at 287. Reasonableness is judged by an objective standard and balances the relative benefit to defendants and harm to plaintiffs. See Pendergrast v. Aiken, 293 N.C. 201, 217, 236 S.E.2d 787, 797 (1977) (listing factors); Watts, 256 N.C. at 618, 124 S.E.2d at 814 (same); Rainey v. St. Lawrence Homes, Inc., 174 N.C. App. 611, 613–14, 621 S.E.2d 217, 220 (2005).

Plaintiffs have plausibly alleged that defendants have interfered with plaintiffs' use and enjoyment of their property by allegedly discharging PFASs and other chemicals. Plaintiffs have plausibly alleged that the interference was both substantial and objectively unreasonable, even though a maximum contaminant level ("MCL") has not been established for GenX or other PFASs. But cf. New Mexico v. Gen. Elec. Co., 335 F. Supp. 2d 1185, 1212 (D.N.M. 2004) ("Under New Mexico law, water need not be pristine to be drinkable, and use for drinking water purposes depends upon whether applicable water quality standards are met, not whether the water yet remains in its

11

primordial state, untouched by any of the chemical remnants of the modern age."). Accordingly, the court denies defendants' motion to dismiss count two.

## C.

In count three, plaintiffs allege that defendants' alleged discharge of chemicals from the Fayetteville Works facility constitutes a trespass to real property [D.E. 35] ¶¶ 115–18. Defendants argue that plaintiffs have not shown damages [D.E. 50] 22–23. Defendants also argue that plaintiffs have maintained publicly that the chemicals in the water are safe to consume. See id.

Under North Carolina law, trespass is "a wrongful invasion of the possession of another." Singleton v. Haywood Elec. Membership Corp., 357 N.C. 623, 627, 588 S.E.2d 871, 874 (2003); State ex rel. Bruton v. Flying 'W' Enters., Inc., 273 N.C. 399, 415, 160 S.E.2d 482, 493 (1968); see Shepard v. Bonita Vista Props., L.P., 191 N.C. App. 614, 631, 664 S.E.2d 388, 399 (2008), aff'd, 363 N.C. 252, 675 S.E.2d 332 (2009) (per curiam); Elec. World, Inc. v. Barefoot, 153 N.C. App. 387, 393, 570 S.E.2d 225, 230 (2002); cf. Matthews v. Forrest, 235 N.C. 281, 283, 69 S.E.2d 553, 555 (1952) ("The essence of a trespass to [real property] is the disturbance of possession."). A claim of trespass to real property requires "(1) possession of the property by plaintiff when the alleged trespass was committed; (2) an unauthorized entry by defendant; and (3) damage to plaintiff." Singleton, 357 N.C. at 627, 588 S.E.2d at 874; Fordham v. Eason, 351 N.C. 151, 153, 521 S.E.2d 701, 703 (1999) (quotation omitted); see, e.g., Elec. World, Inc., 153 N.C. App. at 393, 570 S.E.2d at 230; Jordan, 116 N.C. App. at 166, 447 S.E.2d at 498. Because "every unauthorized entry on land in the peaceable possession of another constitutes a trespass, without regard to the degree of force used and irrespective of whether actual damage is done," a complaint "states a cause of action for the recovery of nominal damages for a properly pleaded trespass to [real property] even if it contains no allegations setting forth the character and amount of damages." Matthews, 235 N.C. at 283, 69

S.E.2d at 555; see Keziah v. Seaboard Air Line R.R., 272 N.C. 299, 311, 158 S.E.2d 539, 548 (1968); Hutton & Bourbonnais v. Cook, 173 N.C. 496, 499, 92 S.E. 355, 356 (1917); Hawkins v. Hawkins, 101 N.C. App. 529, 533, 400 S.E.2d 472, 475 (1991) (noting that trespass to real property is among the torts that "do not include actual damage as an essential element"), aff'd, 331 N.C. 743, 417 S.E.2d 447 (1992).

Plaintiffs have plausibly alleged a claim of trespass to real property. First, plaintiffs have plausibly alleged that they were in possession of real property. Second, plaintiffs have plausibly alleged that defendants, by knowingly discharging chemicals including PFASs, have intentionally and unauthorizedly entered their property. See BSK Enters., Inc., 246 N.C. App. at 24–26, 783 S.E.2d at 252–53; Jordan, 116 N.C. App. at 166–67, 447 S.E.2d at 498; Rudd v. Electrolux Corp., 982 F. Supp. 355, 370 (M.D.N.C. 1997). Finally, plaintiffs have at least plausibly alleged nominal damages. Accordingly, the court denies defendants' motion to dismiss count three.

### D.

In count four, plaintiffs allege that defendants' alleged discharge of chemicals from the Fayetteville Works facility interferes with plaintiffs' "possession and use of their water and water systems," constituting a trespass to chattels [D.E. 35] ¶¶ 119–22. Defendants argue that the plaintiffs have merely made conclusory allegations and otherwise do not plead the required elements of trespass to chattels [D.E. 50] 23–24.

Under North Carolina law, a claim of trespass to chattels requires that the plaintiff show (1) actual or constructive possession of the personal property or chattel at the time of the trespass and (2) an unlawful, unauthorized interference or dispossession of the property by the defendant. See Fordham, 351 N.C. at 155, 521 S.E.2d at 704; Steele v. Bowden, 238 N.C. App. 566, 575, 768 S.E.2d 47, 55 (2014); Kirschbaum v. McLaurin Parking Co., 188 N.C. App. 782, 786–87, 656 S.E.2d

13

683, 686 (2008). A fixture is property that, "though originally a movable chattel," is "regarded as a part of the land." Little ex rel. Davis v. Nat'l Servs. Indus., Inc., 79 N.C. App. 688, 692, 340 S.E.2d 510, 513 (1986) (quotation omitted). "As a general rule, whatever is attached to the land is understood to be a part of the realty." Lee-Moore Oil Co. v. Cleary, 295 N.C. 417, 419, 245 S.E.2d 720, 722 (1978) (quotation omitted); see Wilson v. McLeod Oil Co., 327 N.C. 491, 515, 398 S.E.2d 586, 598 (1990). "The test for determining whether a chattel which has been annexed to land has become real property or remains personal property is the intention with which the annexation was made." Hughes v. Young, 115 N.C. App. 325, 328, 444 S.E.2d 248, 250 (1994); see Brown v. N.C. Joint Stock Land Bank of Durham, 213 N.C. 594, 598, 197 S.E. 140, 142 (1938).

Plaintiffs have identified as chattels water and water systems. Water systems are properly characterized as real property, not personal property. See Lyon v. Ward, 28 N.C. App. 446, 448, 221 S.E.2d 727, 728 (1976); cf. Baker Constr. Co. v. City of Burlington, 200 N.C. App. 435, 683 S.E.2d 790, 2009 WL 3350747, at *5, 7 (Oct. 20, 2009) (unpublished table decision). As for characterizing water as a chattel, the court cannot expand North Carolina public policy to encompass such a claim. Cf. Time Warner, 506 F.3d at 314. Therefore, plaintiffs have not plausibly alleged that defendants have interfered with any chattels in plaintiffs' possession. Accordingly, the court grants defendants' motion to dismiss count four.

E.

In count five, plaintiffs contend that defendants' conduct is negligent per se [D.E. 35] ¶¶ 123–27; see id. ¶¶ 90–93. Plaintiffs contend that defendants' conduct violates defendants' NPDES permit and North Carolina's water quality standards. See id. ¶¶ 90–93.

"Negligence is the failure to exercise proper care in the performance of a legal duty which the defendant owed the plaintiff under the circumstances surrounding them." Dunning v. Forsyth

14

Warehouse Co., 272 N.C. 723, 725, 158 S.E.2d 893, 895 (1968); Moore v. Moore, 268 N.C. 110, 112, 150 S.E.2d 75, 77 (1966); Coulter v. Catawba Cty. Bd. of Educ., 189 N.C. App. 183, 185, 657 S.E.2d 428, 430 (2008). To establish actionable negligence, a plaintiff must show "(1) defendant failed to exercise due care in the performance of some legal duty owed to plaintiff under the circumstances; and (2) the negligent breach of such duty was the proximate cause of the injury." Whisnant v. Carolina Farm Credit, 204 N.C. App. 84, 93–94, 693 S.E.2d 149, 156 (2010); see Ward v. Carmona, 368 N.C. 35, 37, 770 S.E.2d 70, 72 (2015); Bridges v. Parrish, 366 N.C. 539, 541, 742 S.E.2d 794, 796 (2013).

A statute or regulation may provide the required standard of care for individuals such that violation of the statute or regulation is negligent per se (i.e., conclusively establishes both duty and breach of duty in a plaintiff's prima facie case). See, e.g., Hart v. Ivey, 332 N.C. 299, 303, 420 S.E.2d 174, 177 (1992); Estate of Coppick ex rel. Coppick v. Hobbs Marina Props., LLC, 240 N.C. App. 324, 328, 772 S.E.2d 1, 5–6 (2015). To prevail on a claim of negligence per se, a plaintiff must show:

> (1) a duty created by a statute or ordinance; (2) that the statute or ordinance was enacted to protect a class of persons which includes the plaintiff; (3) a breach of the statutory duty; (4) that the injury sustained was suffered by an interest which the statute protected; (5) that the injury was of the nature contemplated in the statute; and (6) that the violation of the statute proximately caused the injury.

Rudd, 982 F. Supp. at 365; see Baldwin v. GTE S., Inc., 335 N.C. 544, 546–47, 439 S.E.2d 108, 109–10 (1994); Hardin v. York Mem'l Park, 221 N.C. App. 317, 326, 730 S.E.2d 768, 776 (2012).

As for plaintiffs' claim based on an alleged violation of defendants' NPDES permit, even assuming that North Carolina courts recognize a right to sue in negligence based on a violation of a NPDES permit, see Biddix v. Henredon Furniture Indus. Inc., 76 N.C. App. 30, 40–41, 331 S.E.2d 717, 724 (1985); Brinkman v. Barrett Kays & Assocs., P.A., 155 N.C. App. 738, 741, 575 S.E.2d

15

40, 43 (2003); cf. Springer v. Joseph Schlitz Brewing Co., 510 F.2d 468, 472 (4th Cir. 1975), plaintiffs fail to plausibly allege any violations of defendants' NPDES permit. In short, plaintiffs raise numerous possible violations but fail to show any specific, plausible violations sufficient to state a claim for relief.

As for plaintiffs' claim based on an alleged violation of North Carolina's water quality standards, plaintiffs refer generally to Subchapter 2L of Title 15A of the North Carolina Administrative Code. The Subchapter 2L regulations are strict liability regulations, and therefore do not create a standard for reasonable care. See Rudd, 982 F. Supp. at 365–66; 15A N.C. Admin. Code 2L.0106, 2L.0202. It would expand North Carolina public policy to allow plaintiffs to proceed on a negligence per se theory based on an alleged violation of a strict liability regulation. Cf. Time Warner, 506 F.3d at 314. Accordingly, violation of a Subchapter 2L regulation cannot constitute negligence per se. Cf. Hurley v. Miller, 113 N.C. App. 658, 666–67, 440 S.E.2d 286, 291 (1994), rev'd on other grounds, 339 N.C. 601, 453 S.E.2d 861 (1995). If plaintiffs allege that violation of the North Carolina 2B or 2H standards constitutes negligence per se, see [D.E. 35] ¶¶ 90, 92, that claim similarly fails. See 15A N.C. Admin. Code 2B.0208(a), 2B.0211, 2B.0216, 2H.0105(j). Accordingly, the court grants defendants' motion to dismiss count five.

F.

In count six, plaintiffs allege that defendants negligently discharged chemicals from the Fayetteville Works facility [D.E. 35] ¶¶ 128–34. Plaintiffs allege that defendants had a duty to identify potentially harmful chemical byproducts of their operations, investigate and understand the characteristics of the byproducts before discharging them, conduct their operations in a manner that would not unreasonably endanger human health and the environment, investigate and remediate environmental releases that defendants knew posed a potential risk to human health and the

16

environment, and warn plaintiffs of the dangers posed by chemicals discharged by defendants. See id. ¶ 130. Defendants respond that plaintiffs have failed to allege a cognizable injury and that mere contamination alone is not sufficient to state a claim. See [D.E. 50] 24–26.

Under North Carolina law, "[n]egligence is the failure to exercise proper care in the performance of a legal duty which the defendant owed the plaintiff under the circumstances surrounding them." Dunning, 272 N.C. at 725, 158 S.E.2d at 895. To state an actionable claim, a plaintiff must allege that (1) defendant owed to plaintiff a legal duty, (2) defendant breached its legal duty, and (3) defendant's breach proximately caused plaintiff's injury. See Fussell v. N.C. Farm Bureau Mut. Ins. Co., 364 N.C. 222, 226, 695 S.E.2d 437, 440 (2010); Whisnant, 204 N.C. App. at 93–94, 693 S.E.2d at 156.

As for duty, defendants owed to plaintiff a duty to exercise ordinary care. See Fussell, 364 N.C. at 226, 695 S.E.2d at 440. "The duty of ordinary care is no more than a duty to act reasonably." Id., 695 S.E.2d at 440. Plaintiffs have plausibly alleged that defendants failed to act reasonably in discharging chemicals from the Fayetteville Works facility. In addition, plaintiffs have plausibly alleged injury as a result of defendants' discharge of chemicals from the Fayetteville Works facility. As for proximate cause, defendants may only be held liable for injuries "that were reasonably foreseeable and avoidable through the exercise of due care." Id., 695 S.E.2d at 440. Plaintiffs have plausibly alleged that defendants could reasonably foresee that plaintiffs' property would be harmed by discharging chemicals from the Fayetteville Works facility. Accordingly, the court denies defendants' motion to dismiss count six.

### G.

In count seven, plaintiffs allege that defendants' negligent failure to warn caused injuries to plaintiffs' properties [D.E. 35] ¶¶ 135–38. Defendants respond that they owe a duty to warn in

17

limited circumstances, none of which apply here. See [D.E. 50] 26.

North Carolina law recognizes a limited duty to warn. Landowners owe to lawful visitors on their land a duty of reasonable care, which includes a duty to warn of hidden or nonobvious dangers. See Nelson v. Freeland, 349 N.C. 615, 631, 507 S.E.2d 882, 892 (1998); Burnham v. S & L Sawmill, Inc., 229 N.C. App. 334, 340, 749 S.E.2d 75, 80 (2013); Fox v. PGML, LLC, 228 N.C. App. 28, 31, 744 S.E.2d 483, 485 (2013); Martishius v. Carolco Studios, Inc., 142 N.C. App. 216, 223, 542 S.E.2d 303, 308 (2001); cf. Branks v. Kern, 320 N.C. 621, 624, 359 S.E.2d 780, 782 (1987), abrogated on other grounds by Nelson v. Freeland, 349 N.C. 615, 507 S.E.2d 882 (1998). In the context of products liability claims, manufacturers and sellers of products owe to potential claimants a duty to provide adequate warning or instruction concerning the products. See N.C. Gen. Stat. § 99B-5; Evans v. Evans, 153 N.C. App. 54, 57–58, 569 S.E.2d 303, 305–06 (2002); Yates v. Ford Motor Co., No. 5:12-CV-752-FL, 2015 WL 2189774, at *2–3 (E.D.N.C. May 11, 2015) (unpublished); Ziglar v. E. I. du Pont de Nemours & Co., 53 N.C. App. 147, 152, 155, 280 S.E.2d 510, 514, 516 (1981).

Plaintiffs have not plausibly alleged a premises liability claim. Moreover, plaintiffs have not plausibly alleged that defendants owed them a duty to warn based on defendants' status as manufacturers. Accordingly, the court grants defendants' motion to dismiss count seven.

## H.

In count eight, plaintiffs allege that defendants negligently manufactured PFASs at the Fayetteville Works facility [D.E. 35] ¶¶ 139–42. "The general rule concerning manufacturer negligence" is that a manufacturer may be held liable if, in manufacturing a product, the manufacturer failed to exercise due care such that "the product's proper use would involve an unreasonable risk of harm to those using it for the purpose [for which] it was manufactured."

18

Cockerham v. Ward, 44 N.C. App. 615, 618–19, 262 S.E.2d 651, 654 (1980); see Red Hill Hosiery Mill, Inc. v. MagneTek, Inc., 138 N.C. App. 70, 74–75, 530 S.E.2d 321, 325–26 (2000); Durkee v. C.H. Robinson Worldwide, Inc., 765 F. Supp. 2d 742, 748 (W.D.N.C. 2011), aff'd sub nom., Durkee v. Geologic Sols., Inc., 502 F. App'x 326 (4th Cir. 2013) (per curiam) (unpublished). Plaintiffs have not plausibly alleged a products liability claim or that defendants, as manufacturers, owed to plaintiffs any duty of care. Plaintiffs have not been injured, if at all, from the use of defendants' products. Accordingly, the court grants defendants' motion to dismiss count eight.

## I.

In count nine, plaintiffs allege interference with their riparian rights [D.E. 35] ¶¶ 143–47. Even assuming that North Carolina law recognizes a separate claim for interference with riparian rights, see Biddix, 76 N.C. App. at 35, 331 S.E.2d at 721, plaintiffs have not plausibly alleged that defendants interfered with their riparian rights. Accordingly, the court grants defendants' motion to dismiss count nine.

## J.

In count ten, plaintiffs request punitive damages [D.E. 35] 148–50. "[A] claim for punitive damages is not a stand-alone claim." Funderburk v. JPMorgan Chase Bank, N.A., 241 N.C. App. 415, 425, 775 S.E.2d 1, 8 (2015). Accordingly, the court grants defendants' motion to dismiss count ten.

## IV.

Alternatively, defendants argue that this court should stay this matter based on the primary jurisdiction doctrine. See [D.E. 50] 27–32. The primary jurisdiction doctrine is "a doctrine specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency." Reiter v. Cooper, 507 U.S. 258, 268 (1993); see

19

Longo v. Trojan Horse Ltd., 992 F. Supp. 2d 612, 616 (E.D.N.C. 2014). The doctrine "is designed to coordinate administrative and judicial decision-making by taking advantage of agency expertise and referring issues of fact not within the conventional experience of judges or cases which require the exercise of administrative discretion." Envtl. Tech. Council v. Sierra Club, 98 F.3d 774, 789 (4th Cir. 1996); see Reiter, 507 U.S. at 268; Smith v. Clark/Smoot/Russell, 796 F.3d 424, 431–32 (4th Cir. 2015). Defendants argue that this court should stay this matter until North Carolina's Department of Environmental Quality has resolved its inquiry into GenX and the Fayetteville Works facility. See [D.E. 50] 27–32.

In deciding whether to apply the primary jurisdiction doctrine, a court may consider factors such as "(1) whether the question at issue is within the conventional experience of judges or is within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made." Longo, 992 F. Supp. 2d at 617; see Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co., 46 F.3d 220, 222–23 (2d Cir. 1995). The court finds that none of the factors weigh in favor of staying this matter. Accordingly, the court denies defendants' request to stay the proceedings pursuant to the primary jurisdiction doctrine.

## V.

In sum, the court enters this order to explain why the court GRANTED IN PART and DENIED IN PART defendants' motion to dismiss the Master Complaint, DENIED defendants' motion to stay, and GRANTED defendants' motion to strike plaintiffs' Notices to Conform [D.E. 49]. The court DISMISSES WITHOUT PREJUDICE counts one, four, five, seven, eight, nine, and ten.

20

SO ORDERED. This 19 day of April 2019.

_J. Dever_
JAMES C. DEVER III
United States District Judge

21